**FILED**
**CLERK**

2/5/2016 2:53 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
ASSOCIATED MORTGAGE BANKERS, INC.,
        Plaintiff,

      -against-

CALCON MUTUAL MORTGAGE LLC, doing
business as One Trust Home Loans, ARLENE
BALTAZAR, MATHEW DLUGOLENSKI,
JOSHUA ERSKINE, SHANE ERSKINE,
MATHEW GLYNN, JOSEPH TAKO,
ROSEMERE INVESTMENTS LLC, JOHN AND
JANE DOES 1 THROUGH 100, JOHN DOE
CORPORATIONS 1 THROUGH 10, and JOHN
DOE ENTITIES 1 THROUGH 10

        Defendants.
--------------------------------------------------------X
CALCON MUTUAL MORTGAGE LLC,
JOSHUA ERSKINE, and SHANE ERSKINE,
        Counterclaim Plaintiffs,

      -against-

ASSOCIATED MORTGAGE BANKERS, INC.,
DONALD MORAN, ADAM SALTI, MAX
KANE, and ROES 1 THROUGH 50,
        Counterclaim and
        Third-Party Defendants.
--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION & ORDER**
13-cv-5927 (ADS)(AKT)

**<u>APPEARANCES:</u>**

**Gordon & Rees LLP**
*Attorneys for the Plaintiff/Counterclaim Defendant Associated Mortgage Bankers, Inc.*
18 Columbia Turnpike, Suite 220
Florham Park, NJ 07932
      By: Peter G. Siachos, Esq.
         JoAnna Marie Doherty, Esq.
         Stacey Lee Trien, Esq., Of Counsel

**Giskan Solotaroff Anderson & Stewart LLP**
*Attorneys for the Defendants and Counterclaim Plaintiffs*
11 Broadway, Suite 2150
New York, NY 10004
      By: Jason L. Solotaroff, Esq.
          Aliaksandra Ramanenka, Esq., Of Counsel

**Brendan Chao, Esq.**
*Attorney for the Third-Party Defendant Donald Moran*
50 Merrick Road
Rockville Centre, NY 11570

**Valli & Kane, LLP**
*Attorneys for the Third-Party Defendant Adam Salti*
600 Old Country Road, Suite 207
Garden City, NY 11530
      By: Robert John Valli, Jr., Esq., Of Counsel

**SPATT, District Judge.**

This case arises from a dispute related to the unwinding of a merger between the Plaintiff Associated Mortgage Bankers, Inc. (the "AMB") and the Defendant CalCon Mutual Mortgage LLC, doing business as One Trust Home Loans ("CalCon").

Presently before the Court is a motion by AMB pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 15(a) for leave to file a second amended complaint.

For the reasons set forth below, the motion by AMB is granted in part and denied in part.

## I. BACKGROUND

### A. The Proposed Amended Complaint

Unless otherwise stated, the following facts are drawn from the proposed second amended complaint ("SAC") and are construed in the light most favorable to AMB.

#### 1. The Parties

AMB is a New York corporation with its principal place of business in Garden City, New York. It is a "small New York bank that specialized in home mortgages."

CalCon is a Delaware limited liability company with its principal place of business in San Diego, California. It is a mortgage broker.

Joshua Erskine is the majority owner of CalCon and its current Chief Executive Officer ("CEO").

Shane Erskine is a minority owner of CalCon and its current Chief Operating Officer ("COO").

Rosemere Investments, LLC ("Rosemere") is a Delaware limited liability corporation that is a shareholder and **a** member of CalCon.

Arlene Baltazar ("Baltazar"), Mathew Dlugolenski ("Dlugolenski"), and Matthew Glynn ("Glynn") are former employees of AMB who are now currently employed by CalCon.

Joseph Tako ("Tako") was employed by AMB from June 8, 2012 to April 2, 2013 and worked for CalCon until July 2013.

## 2. The Merger

On December 1, 2011, AMB and CalCon entered into an agreement (the "Merger Agreement"). Under the terms of the Merger Agreement, AMB purchased all outstanding stock of CalCon in exchange for issuing 400 shares of AMB's stock, which represented a 40% interest in the company, to Joshua Erskine, the CEO of CalCon.

According to the SAC, the New York State Banking Department ("NSBD") rules and regulations required NSBD to approve a merger before it becomes final.

In 2011, prior to receiving the approval of the NSBD, both companies transferred their assets, employees, and leases to a new company, which the SAC refers to as "CalCon Mutual." This new entity appears to share the same name as CalCon. Thus, it is not entirely clear from the SAC what the difference between CalCon and CalCon Mutual. However, for ease of reference,

the Court will refer to "CalCon Mutual" as a separate entity representing the combined assets of CalCon and AMB.

From December 1, 2011 to the Fall of 2012, the parties operated CalCon Mutual and worked to expand its operations in west coast offices located in California, Hawaii, Wyoming, Colorado, Utah, and Nevada.

During this period, Joshua Erskine allegedly "sought to control increasingly large portions of CalCon Mutual's operations," which according to the SAC, "was not in the best interest of the company or its employees."

In the Fall of 2012, when AMB allegedly refused to give complete control of CalCon Mutual to Joshua Erskine, he sought to rescind the Merger Agreement. Thereafter, the parties began to negotiate the terms of an agreement to rescind the Merger Agreement and unwind CalCon Mutual.

### 3. The Rescission Agreement

On January 8, 2013, the parties finalized an agreement to rescind the Merger Agreement and to transfer CalCon Mutual's assets and West Coast business operations to Joshua Erskine and CalCon (the "Rescission Agreement"). The Agreement provided for a transition period, from January 8, 2013 through June 30, 2013 (the "Transition Period"), during which time "CalCon agreed to use commercially reasonable efforts to make a transition of the West Coast Business to CalCon as promptly as possible."

Similarly, Section II(h) of the Agreement obligated CalCon to use its "best efforts to consummate the unwinding and facilitate a smooth transition of the West Coast Business to [CalCon], including, but not limited to, transition of the assets, contracts, employees and independent contractors involved and associated with the West Coast Business."

Also under Section II(h), the parties agreed to "communicate regularly to enable AMB and [CalCon] to maintain their operations and transition the West Coast Business to [CalCon] as quickly as possible" and to "use their best efforts to identify the nature and extent of all transition services that each of them may require."

Finally, CalCon allegedly agreed to hire 48 former CalCon Mutual employees. According to the SAC, Section IV(h) of the Rescission Agreement stated that following the end of the Transition Period, AMB "shall not be obligated to incur any additional costs or expenses in connection with [the transition of the Transition Employees] and any such expenses or costs shall be paid or reimbursed by [CalCon]."

**4. CalCon's Alleged Wrongful Acts**

The SAC alleges that CalCon committed seven alleged wrongful acts during and after the Transition Period.

First, as of April 2, 2013, three months after the Transition Period began, CalCon had not hired any individuals from the list of CalCon Mutual employees it had agreed to hire under the Rescission Agreement. During the Transition Period, AMB was apparently required to pay the costs and overhead of these employees.

On April 2, 2013, AMB allegedly requested that CalCon move more quickly to re-assign the 48 employees. However, CalCon waited until June 30, 2013, the end of the Transition Period, to hire the "vast majority" of the 48 employees. According to the SAC, during this period of delay, AMB was paying these employees to do work which was exclusively for the benefit of CalCon.

Second, according to the SAC, after the employees were transferred to CalCon from CalCon Mutual, CalCon delayed in paying them their new salaries and benefits. As a result,

many of the employees allegedly initiated wage claims against AMB for their lost salaries and benefits, at the behest of CalCon.

Third, on March 2013, during the Transition Period, Tako, then a CalCon Mutual employee, worked with Joshua and Shane Erskine to create a reverse mortgage platform. At the time, Tako was being paid by AMB. However, the reverse mortgage platform was allegedly solely for the benefit of CalCon and not AMB.

Fourth, under the Rescission Agreement, during the Transition Period, AMB was allegedly required to pay expenses associated with loans originated by CalCon in exchange for receiving the profits from the closing, funding, and sale of those loans. A separate provision of the Agreement allegedly required CalCon to reimburse AMB for a portion of the loan expenses if the monthly loan volume decreased below $20 million.

In June 2013, the loan volume decreased below the $20 million threshold, and AMB demanded that CalCon pay its share of the loan expenses. However, CalCon allegedly refused to do so.

Fifth, in April 2013, CalCon allegedly failed to respond to AMB's proposal to hold a "hands on meeting" with representatives of both companies to advance the wind down of CalCon Mutual. In May and June 2013, CalCon allegedly "rebuffed AMB's many efforts to effectuate the wind down."

Sixth, on July 1, 2013, CalCon sought authorization to transfer 145 loans from CalCon Mutual to CalCon. The SAC refers to these 145 loans as the "West Coast Pipeline Loans."

On July 1, 2013, AMB allegedly denied CalCon's request to obtain the West Coast Pipeline Loans because AMB paid the expenses associated with originating, underwriting, and

managing those loans. Thus, AMB believed that it, not CalCon, was entitled to the proceeds derived from the closing of those loans.

Subsequently, the SAC alleges "[u]pon information and belief" that Joshua and Shane Erskine, Baltazar, Dlugolenski, and Glynn — all of whom were CalCon employees at that time — "issued denial letters that deceivingly indicated that AMB was declining to fund West Coast Pipeline Loans to prospective borrowers in or around June or July 2013."

Also on July 1, 2013, Glynn and Dlugolenski allegedly "sought access to AMB's loan processing software" so that they could "monitor and manage the West Coast Pipeline Loans." The SAC does not specify whether AMB ever granted Glynn and Dlugolenski access to the loan processing software, or whether they ultimately accessed the software.

On July 2, 2013, the SAC alleges that "counsel for CalCon indicated to AMB that CalCon wished to move the West Coast Pipeline Loans to CalCon[] but conceded that some loans would have to stay with AMB."

On July 17, 2013, CalCon caused the transfer of approximately 94% of the West Coast Pipeline Loans from CalCon Mutual to CalCon. The aggregate value of the loans was $51 million. The SAC does not specify whether AMB actually authorized these transfers.

Seventh, the SAC alleges "upon information and belief" that Juan Farias ("Farias"), who was an employee of the Nevada Office of CalCon Mutual, was presented with an opportunity by an unidentified individual to purchase real estate notes at a discounted price. Farias informed Joshua Erskine, his supervisor at the time, about the notes.

In response, Erskine allegedly instructed Farias to send all future communications about the notes to his personal email account and to refrain from telling anyone at AMB about the notes. The SAC further alleges, also "upon information and belief," that following the end of the

Transition Period, CalCon purchased the "[n]otes at a discount and sold the [n]otes on the open market, generating a high six-figure profit."

## B. The Procedural History

On October 1, 2013, AMB commenced this action in New York State Supreme Court, Nassau County, against CalCon, Baltazar, Dlugolensk, Joshua Erskine, Shane Erskine, Glynn, Tako, Rosemere, John and Jane Does 1 through 11, John Doe Corporations 1 through 10, and John Doe Entities 1 through 10 (collectively, the "Defendants").

AMB asserted seven causes of action against the Defendants, including: three breach of contract claims; one claim for breach of a duty of loyalty; two claims for breach of an implied covenant of good faith; and one claim for "tortious interference, fraudulent inducement, and conversion."

On October 28, 2013, the Defendants filed a timely notice of removal to federal court pursuant to 28 U.S.C. §§ 1441 and 1446(a) on the basis of diversity of citizenship.

On December 20, 2013, the Defendants filed separate answers to the complaint. In addition, CalCon filed counterclaims against AMB and third-party claims against Donald Moran ("Moran"), Adam Salti ("Salti"), and Max Kane ("Kane") — all of whom were employees of AMB and parties to the Rescission Agreement — and Roes 1 Through 50, which are unidentified partners or entities affiliated with AMB (collectively, the "Counterclaim Defendants"). Specifically, CalCon asserted two counterclaims against the Counterclaim Defendants for breach of contract and tortious interference with contract.

On August 19, 2014, AMB filed an amended complaint which added two new causes of action against the Defendants for "breach of fiduciary duty, waste fraud and conversion of AMB

assets and misappropriation of business opportunity" and "civil conspiracy to commit breach of fiduciary duty, waste, conversion and theft of business opportunity."

On November 21, 2014, CalCon filed an answer to the amended complaint. It also added claims against the Counterclaim Defendants for common law conversion and negligence.

As noted, presently before the Court is a motion by AMB to amend its complaint for a second time. The proposed SAC makes the following changes: (i) it adds, changes, and removes allegations in the existing causes of action; (ii) it removes the two recently added causes of action for breach of duty of fiduciary duty and civil conspiracy to commit a breach of fiduciary duty; and (iii) it adds claims for unjust enrichment, violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* ("CFAA"), and an accounting.

The Court will now address each of the proposed amendments.

## II. DISCUSSION

### A. The Legal Standard

Pursuant to Fed. R. Civ. P. 15(a)(1), a party may amend its pleading once as a matter of course 21 days after serving the pleading or 21 days after the service of a responsive pleading or a motion under Rule 12(b), (e), or (f). Subsequent amendments can only be granted on consent of the opposing party or with leave of court, which Rule 15(a)(2) states should be "freely give[n] . . . when justice so requires."

As this is AMB's second attempt to amend the complaint and the Defendants oppose the proposed amendment, it must obtain leave from the Court. In that regard, "[l]eave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 505 (2d Cir. 2014) (quoting McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007)).

A proposed new pleading is futile when it "fails to state a claim on which relief can be granted." Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012). Accordingly, "[t]he adequacy of a proposed amended complaint to state a claim is to be judged by the same standards as those governing the adequacy of a filed pleading." Id.; see also Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991) (same).

Thus, in determining whether a proposed amendment is futile, a court must accept all allegations in the proposed amended complaint as true and draw all reasonable inferences in the plaintiff's favor. Pension Committee of University of Montreal Pension Plan v. Banc of America Securities LLC, 568 F.3d 374, 381 (2d Cir.2009). However, a court need not accept "'labels and conclusions, and a formulaic recitation of the elements of a cause of action'" and must also be satisfied that the "'[f]actual allegations [are] enough to raise a right to relief above the speculative level.'" Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

**B. As to the Existing Causes of Action**

As an initial matter, the proposed SAC contains certain non-controversial changes, including: (i) adding, editing, and removing allegations from the existing causes of action; and (ii) removing the eighth and ninth causes of action for breach of fiduciary duty and civil conspiracy to commit a breach of fiduciary duty.

The Defendants do not appear to object to these changes and instead focus their arguments solely on the new claims added to the SAC. (See the Defs.' Opp'n Mem. of Law, Dkt. No. 116, at 3–15.) Further, the Court sees no bad faith or improper motive on the part of

AMB in proposing these changes, nor does the Court find that prejudice to the Defendants would result from removing causes of action and simplifying the existing allegations.

Accordingly, the Court grants AMB's motion to amend the complaint by removing the eighth and ninth causes of action and revising the existing allegations. The Court will now turn to AMB's proposed new claims for violation of the CFAA, unjust enrichment, and an accounting.

## C. As to the New Causes of Action

As noted, the Defendants oppose AMB's motion because they assert that (i) the new claims fail as a matter of law and thus, granting AMB leave to add the new claims would be futile; and (ii) the new claims were brought with undue delay and will result in undue prejudice to the Defendants. (See the Defs.' Opp'n Mem. of Law, Dkt. No. 116, at 3–15.)

In reply, AMB asserts that (i) its new claims are sufficiently alleged; (ii) it did not delay in requesting leave to amend; and (iii) the Defendants would not be prejudiced by granting AMB leave to add the new claims. (See the Pl.'s Reply Mem. of Law, Dkt. No. 117, at 2–8.)

As explained below, the Court finds that the new claims asserted in the SAC fail as a matter of law and therefore, need not address the issues of delay and prejudice.

### 1. The CFAA Claim

The SAC asserts a new claim that the Defendants violated the CFAA based on allegations that Joshua and Shane Erskine, Baltazar, Dlugolenski, and Glynn "intentionally accessed AMB's protected computer without authorization following the Transition Period."

"Congress enacted the CFAA in 1984 to address 'computer crime,' which was then principally understood as 'hacking' or trespassing into computer systems or data." United States

v. Valle, 807 F.3d 508, 525 (2d Cir. 2015); see also H. R. Rep. No. 98–894, at 3691–92, 3695–97 (1984); S. Rep. No. 99–432, at 2480 (1986)).

To that end, the CFAA imposes criminal liability on individuals who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." 18 U.S.C.A. § 1030(a)(4).

In addition, the CFAA provides a civil cause of action for such conduct provided that the plaintiff can also show one of the following:

> (I) loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value;

> (II) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

> (III) physical injury to any person;

> (IV) a threat to public health or safety;

> (V) damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security; or

> (VI) damage affecting 10 or more protected computers during any 1-year period[.]

18 U.S.C. § 1030(c)(4)(A); see also id. at § 1030(g).

Here, AMB's proposed CFAA claim relies solely on the first category. Accordingly, to state a claim, it must plead allegations sufficient to show that the Defendants: (i) "knowingly and with intent to defraud"; (ii) accessed a "protected computer"; (iii) "without authorization" or "exceeded their authorized access"; (iv) and by means of such conduct furthered the intended

fraud and obtained anything of value; and (v) caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." See id. at §§ 1030(c)(4)(A), § 1030(g).

The Defendants allege that the CFFA claim is insufficient because: (i) AMB has failed to cite to the appropriate provision of the CFAA; (ii) AMB failed to allege that the Defendant accessed a "protected computer" within the meaning of the CFAA; (iii) AMB has not sufficiently alleged that the Defendants accessed its computer "without authorization" or that they "exceeded their authorized access"; (iv) AMB failed to allege that it suffered a "loss" relating to its computer system; and (v) all of AMB's allegations with respect to the Defendants' alleged misconduct are made "upon information and belief" and therefore, are too speculative to state a claim. (See the Defs.' Opp'n Mem. of Law, Dkt. No. 116, at 5–9.)

In opposition, AMB asserts that (i) its failure to cite to a specific provision of the CFAA does not render its claim futile; (ii) it has made allegations from which it is plausible to conclude that the Defendants accessed a "protected computer"; (iii) it has sufficiently alleged that the Defendants did not have authority to access AMB's loan software; (iv) it has alleged that it suffered a loss exceeding $5,000 as a result of the Defendants' actions; (v) it is permissible for them to make allegations "upon information and belief" at this stage of the litigation. (The Pl.'s Reply Mem. of Law, Dkt. No. 117, at 3–5.)

The Court agrees with the Defendants that AMB has not sufficiently alleged that the Defendants entered its loan processing software without authorization or in excess of their existing authority and therefore, does not reach the Defendants' remaining contentions.

As noted earlier, the CFAA imposes both civil and criminal liability on individuals in certain circumstances who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the

13

intended fraud and obtains anything of value[.]"  18 U.S.C. § 1030(a)(4) (emphasis added); <u>see</u> <u>also</u> <u>id.</u> at § 1030(g).

The CFAA states that the term, "exceeds authorized access," "means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter[.]"  <u>Id.</u> at § 1030(e)(6).  However, the word "authorization" is not defined by the statute.

Recently, in <u>United States v. Valle</u>, 807 F.3d 508, 511 (2d Cir. 2015), the Second Circuit clarified the meaning of "exceeds authorized access."  In that case, the defendant was an officer with the New York City Police Department ("NYPD") who engaged in Internet chats with other individuals which consisted of "gruesome and graphic descriptions of kidnapping, torturing, cooking, raping, murdering, and cannibalizing various women," including his wife.  <u>Id.</u> at 512. The Government subsequently indicted him on one count of conspiracy to commit kidnapping and one count of "accessing a government computer and obtaining information" in violation of the CFAA.  <u>Id.</u>  The basis for the CFAA count was that the defendant accessed an NYPD database to search for information about one of the women he discussed kidnapping in the chatrooms.  <u>Id.</u> at 512–13.  It was undisputed that the defendant, as an NYPD officer, had access to the database but that NYPD policy prohibited officers from using the database to run searches for personal purposes.  <u>Id.</u>

Ultimately, the jury in <u>Valle</u> found the defendant guilty on both counts.  Subsequently, he moved for acquittal and a new trial on both counts.  <u>Id.</u> at 513–14.  The district court granted his motion for acquittal on the conspiracy count but denied his motion with respect to the CFAA count because it found that the defendant had not been authorized to input the woman's name

"without a law enforcement reason for doing so" and therefore, had "exceeded his authorized access" within the meaning of the CFAA. Id. at 515.

On appeal in Valle, the Second Circuit affirmed the district court's holding on the conspiracy count but reversed on the CFAA count. Id. In so doing, the court noted that the six other Circuit courts had split over the meaning of "exceeds authorized access." See id. at 525. The Fifth, Eleventh, and Seventh Circuits had adopted the government's interpretation of the phrase to encompass an employee, like the defendant, who accesses a protected computer with a purpose contrary to the employer's policy or interests on the theory that once an employee violates company policy, his or her access to the protected computer is impliedly revoked. See id.; see also Int'l Airport Centers, L.L.C. v. Citrin, 440 F.3d 418, 420-21 (7th Cir. 2006) ("Citrin's breach of his duty of loyalty terminated his agency relationship . . . and with it his authority to access the laptop, because the only basis of his authority had been that relationship.").

However, the Fourth and Ninth Circuits adopted the defendant's narrower interpretation of "exceeds authorized access" to only cover an individual "who obtains or alters information that he does not have authorization to access for any purpose." See Valle, 807 F.3d at 512, 525. That is because those courts found that the broader interpretation that "revokes authorization when an employee uses his access for a purpose contrary to the employer's interests" would "mean . . . any employee who checked the latest Facebook posting or sporting event scores in contravention of his employer's use policy[.]" Id. (quoting WEC Carolina Energy Sols. LLC v. Miller, 687 F.3d 199, 206 (4th Cir. 2012)).

Although the Second Circuit in Valle found that the language and legislative history of the CFAA supported both interpretations of "exceeds authorized access," it followed the Fourth

and Ninth Circuit because it agreed that the broader interpretation of "exceeds authorized access" "would criminalize the conduct of millions of ordinary computer users and place us in the position of a legislature." Id. at 527. Because the rule of lenity requires courts to 'construe criminal statutes narrowly so that Congress will not unintentionally turn ordinary citizens into criminals,'" the court adopted the narrower reading of "exceeds authorized access." Id. at 528 (quoting United States v. Nosal, 676 F.3d 854, 862 (9th Cir. 2012)). Applying the narrower interpretation of "exceeds authorized access" — namely, that an employee only "exceeds authorized access" when he obtains or alters information that he does not have authorization to access for any purpose —, the court reversed the judgment of conviction on the CFAA count. See id.

As noted, the Second Circuit in Valle cited with approval the reasoning of WEC Carolina Energy Solutions LLC v. Miller, 687 F.3d 199 (4th Cir. 2012), a Fourth Circuit case with facts closely analogous to the present action. There, the plaintiff-company brought civil claims against its former employee under 18 U.S.C. § 1030(a)(4) and other provisions of the CFAA based on allegations that prior to resigning and going to work for the plaintiff's competitor, the employee downloaded the plaintiff's confidential and propriety documents and later used them in a pitch to the plaintiff's former customer. Id. at 202. As a result, the plaintiff allegedly lost two projects to its competitor. Id. The district court granted the defendant's motion to dismiss, finding that his "alleged conduct — the violation of policies regarding the use and downloading of confidential information — did not contravene [the CFAA]." Id.

On appeal, the Fourth Circuit affirmed. Reviewing the plain language of the CFAA, the court concluded that an individual "accesses a computer 'without authorization' when he gains admission to a computer without approval." Id. at 204. Further, according to the court, "an

employee 'exceeds authorized access' when he has approval to access a computer, but uses his access to obtain or alter information that falls outside the bounds of his approved access." <u>Id.</u> The court reasoned that a contrary interpretation would violate the rule of lenity because it would impute liability to innocent employees who, for example, "with commendable intentions disregards his employer's policy against downloading information to a personal computer so that he can work at home and make headway in meeting his employer's goals." <u>Id.</u> at 206.

Applying the narrow interpretation of the CFAA to the complaint, the court in <u>Miller</u> found that the plaintiff's CFAA claims were not sufficiently pled because the plaintiff failed to allege that the defendant or his assistant "accessed a computer or information on a computer without authorization." <u>Id.</u> at 207. Indeed, the court noted that the complaint "belie[d] such a conclusion because it state[d] that [the defendant] 'had access to [the plaintiff's] intranet and computer servers' and 'to numerous confidential and trade secret documents stored on these computer servers, including pricing, terms, pending projects [,] and the technical capabilities of [the plaintiff].'" <u>Id.</u> Accordingly, the court found that the district court properly dismissed the CFAA claim. <u>See</u> <u>id.</u>

Here, similar to the complaint in <u>Miller</u>, the SAC does not plead allegations sufficient to infer that the Defendants entered an AMB computer "without authorization" or in "excess of authorized access." Rather, the SAC focuses primarily on the Defendants' alleged misappropriation of AMB's loans. For example, the SAC alleges that the Defendants "issued denial letters that deceivingly indicated that AMB was declining to fund West Coast Pipeline Loans to prospective borrowers in or around June or July 2013." The SAC also alleges that the Defendants "sought access to AMB's loan processing software" so that they "could 'monitor and

manage' the West Coast Pipeline Loans" but does not specify whether the Defendants' request for authorization was denied.

Similarly, AMB alleges that on July 1, 2013, CalCon sought authorization to move West Coast Pipeline Loans from AMB to CalCon, which AMB initially denied. Subsequently, on July 2, 2013, counsel for CalCon allegedly made a second a request to transfer 94% of the West Coast Pipeline Loans, and on July 17, 2013, those loans were transferred from CalCon Mutual to CalCon. Again, these allegations do not specify whether AMB denied CalCon's second request to transfer the West Coast Pipeline Loans, nor do they explain why the Defendants would have to access AMB's "loan processing software" to obtain the loans from CalCon Mutual.

Therefore, while it may be plausible to infer from the SAC that the Defendants misappropriated the West Coast Pipeline Loans from AMB, the SAC does not adequately allege that the Defendants entered AMB's protected computer "without authorization" or "exceeded [their] authorized access" in violation of the CFAA. See Miller, 687 F.3d at 206-07 (affirming the dismissal of a CFAA claim because "WEC fails to allege that Miller and Kelley accessed a computer or information on a computer without authorization . . . . Thus, we agree with the district court that although Miller and Kelley may have misappropriated information, they did not access a computer without authorization or exceed their authorized access."); LivePerson, Inc. v. 24/7 Customer, Inc., 83 F. Supp. 3d 501, 513 (S.D.N.Y. 2015) ("[T]he Complaint does not adequately allege that Defendant exceeded its authorized access with respect to Plaintiff's computer system. Plaintiff's allegations focus primarily on Defendant's misuse of data obtained through authorized access . . . . Other allegations of Defendant's purported abuses of the Plaintiff's systems do not discuss the means by which Defendants allegedly gained access to

those systems and so cannot be construed as establishing that Defendant either lacked or exceeded its authorization within the meaning of the CFAA.").

Accordingly, AMB's motion to amend the complaint to add a CFAA claim is denied as futile. The Court will now to turn to AMB's proposed claims for unjust enrichment and an accounting.

### 2. The Unjust Enrichment Claim

Initially, the Court notes that in their legal memoranda, both parties apply New York law to the proposed unjust enrichment and accounting claims. Accordingly, the Court will also apply New York law to both of AMB's equitable claims for unjust enrichment and accounting. See AIG Europe (Netherlands), N.V. v. UPS Supply Chain Sols., Inc., 765 F. Supp. 2d 472, 479 (S.D.N.Y. 2011) ("[W]here the parties' 'briefs assume that New York law controls, . . . such 'implied consent . . . is sufficient to establish choice of law.'") (quoting DeBlasio v. Merrill Lynch & Co., No. 07 Civ 318 (RJS), 2009 WL 2242605, at *19 n. 14 (S.D.N.Y. July 27, 2009)); see also Tehran-Berkeley Civil & Envtl. Engineers v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989) ("The parties' briefs, however, rely on New York law. Under the principle that implied consent to use a forum's law is sufficient to establish choice of law[.]").

 "The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004); see also Clark v. Daby, 300 A.D.2d 732, 732, 751 N.Y.S.2d 622, 623 (3d Dep't 2002) (same).

The SAC alleges that under the Rescission Agreement, CalCon was obligated to use commercially reasonable efforts to transition 48 employees from CalCon Mutual to CalCon as

part of the process to wind down the operations of CalCon Mutual. However, the SAC alleges that CalCon unduly delayed in transitioning the 48 employees so as to avoid having to pay their salaries and benefits.

As a result, the SAC asserts that CalCon was unjustly enriched at AMB's expense because (i) some of the employees were performing work solely for the benefit of CalCon; and (ii) AMB was paying for the employees' salaries and benefits during the Transition Period. Thus, as alleged, AMB was essentially paying the salaries of CalCon Mutual employees to do work that benefited CalCon and not AMB.

The Defendants assert that the proposed unjust enrichment claim fails as a matter of law because (i) AMB does not dispute the existence of the Rescission Agreement; and (ii) the Rescission Agreement applies to the subject matter of AMB's claim. (The Defs.' Opp'n Mem. of Law, Dkt. No. 116, at 9–10.)

In reply, AMB asserts that it has a right to plead an unjust enrichment claim in the alternative to its breach of contract claim. In addition, it offers revisions to the SAC which it contends "cures any pleading deficiency." (The Pl.'s Reply Mem. of Law, Dkt. No. 117, at 6.) Again, the Court agrees with the Defendants.

"'Quantum meruit and unjust enrichment are not separate causes of action'" and are therefore analyzed under the same principles. Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005) (quoting parenthetically Seiden Assocs., Inc. v. ANC Holdings, Inc., 768 F.Supp. 89, 96 (S.D.N.Y. 1991)). "New York law does not permit recovery in quantum meruit . . . if the parties have a valid, enforceable contract that governs the same subject matter as the quantum meruit claim." Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005) (citing Clark-

Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d 382, 388, 516 N.E.2d 190, 193 (N.Y. 1987)). That is because recovery on a quantum meruit claim is based on a "quasi contract" theory which "only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment." Clark-Fitzpatrick, Inc. 70 N.Y.2d at 388 (citing Parsa v. State, 64 N.Y.2d 143, 148, 474 N.E.2d 235, 237 (N.Y. 1984)); see also Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F.3d 573, 586 (2d Cir. 2006) ("'The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement.'") (emphasis added) (quoting Goldman v. Metropolitan Life Ins. Co., 5 N.Y.3d 561, 572, 807 N.Y.S.2d 583, 841 N.E.2d 742 (N.Y. 2005)).

Thus, New York courts "have permitted pleading [unjust enrichment] in the alternative in the face of a written agreement . . . when there is a dispute as to the agreement's validity or enforceability." Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC, 637 F. Supp. 2d 185, 195 (S.D.N.Y. 2009); see also Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996) ("Where the complaint asserts claims on theories of both contract and quantum meruit and there is a genuine dispute as to the existence of a contract, the plaintiff need not make a pretrial election between these theories; he is entitled to have the case submitted to the jury on both theories.").

However, New York courts have repeatedly dismissed unjust enrichment claims where there is no allegation that the contract at issue is invalid and the subject matter of the dispute is covered by the contract. See, e.g., Sikarevich Family L.P. v. Nationwide Mut. Ins. Co., 30 F. Supp. 3d 166, 172 (E.D.N.Y. 2014) ("The Policy is central to plaintiff's unjust enrichment theory: Plaintiff argues that Nationwide was unjustly enriched because plaintiff paid premiums pursuant to the Policy's terms, but defendant did not provide it coverage as the Policy required.

Therefore, plaintiff cannot plead its unjust enrichment claim in the alternative to its breach of contract claim. Plaintiff's unjust enrichment claim and requests for declaratory judgment, consequential damages, and punitive damages related to the claim are therefore dismissed."); Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 203 (S.D.N.Y. 2011) ("While alternative quasi-contract claims may survive dismissal under Rule 8(d) where there is a dispute as to the validity of a governing contract, . . . , 'the existence of a valid and binding contract governing the subject matter at issue in a particular case does act to preclude a claim for unjust enrichment[.]'") (quoting Network Enters., Inc. v. Reality Racing, Inc., No. 09 Civ. 4664(RJS), 2010 WL 3529237, at *7 (S.D.N.Y. Aug. 24, 2010)); King's Choice Neckwear, Inc. v. Pitney Bowes, Inc., No. 09 CIV. 3980 (DLC), 2009 WL 5033960, at *7 (S.D.N.Y. Dec. 23, 2009) ("Since it is undisputed that the Lease Agreement is an enforceable contract, Kings Choice has failed to state a claim for unjust enrichment.").

Here there is no dispute as to the validity of the Rescission Agreement. Further, the unjust enrichment claim, as alleged in the SAC, is based upon the Defendants' alleged breach of their obligation under the Rescission Agreement to "use commercially reasonable efforts to timely [t]ransition [e]mployees" from CalCon Mutual to CalCon. Accordingly, as pled in the SAC, AMB cannot allege an unjust enrichment claim in the alternative to its breach of contract claim.

In reply, AMB attempts to save its unjust enrichment claim by submitting a revised SAC which removes the reference to the provision of the Rescission Agreement and instead states that "AMB incurred expenses related [to] [CalCon's] growth from a small mortgage broker to a large mortgage lender," which include "providing CCMMC with larger office spaces, computers, office fixtures, and telephone systems; providing CCMMC with access to and opportunities with

east coast clients; and providing CCMMC with resources and human capital to expand CCMMC's west coast business operations." The revised SAC further alleges that because CalCon failed to compensate AMB "for time, money, and other resources used for [CalCon's] expand and growth," CalCon was unjustly enriched.

However, according to the revised SAC, the Rescission Agreement set forth CalCon's obligation to reimburse AMB for expenses associated with the operations of CalCon Mutual's west coast business while the company was being unwound. Indeed, AMB's breach of contract claim alleges that the Defendants breached the Rescission Agreement by engaging in the same conduct alleged with respect to the unjust enrichment claim — namely, that the Defendants failed to reimburse AMB for the expenses it incurred while winding down CalCon Mutual, including, among other things, the money it paid for employees, overhead costs, and security deposits. Thus, the Court finds that the Rescission Agreement does cover the expenses sought in AMB's revised unjust enrichment claim and therefore, the claim remains deficient as a matter of law.

Accordingly, the Court also denies as futile AMB's motion seeking to add an unjust enrichment claim.

### 3. The Accounting Claim

"To state a claim for an accounting under New York law, a plaintiff must establish: (1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal." Rosa v. TCC Commc'ns, Inc., No. 15CV1665, 2016 WL 67729, at *7 (S.D.N.Y. Jan. 5, 2016) (citing IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009)); see also Soley v. Wasserman,

No. 14-2820-CV, 2016 WL 321176, at *2 (2d Cir. Jan. 27, 2016) (Summary Order) ("New York law clearly requires that a principal demonstrate the unavailability of an 'adequate remedy at law' in order to prevail on a claim for an equitable accounting, in addition to establishing the existence of a fiduciary relationship."); accord Unitel Telecard Distribution Corp. v. Nunez, 90 A.D.3d 568, 569, 936 N.Y.S.2d 17, 18 (1st Dep't 2011); Kastle v. Steibel, 120 A.D.2d 868, 869, 502 N.Y.S.2d 538, 539 (3d Dep't 1986).

With respect to the first element, it is well-established that "to sustain an equitable action for accounting under New York law, a plaintiff must show either a fiduciary or confidential relationship with the defendant." Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc., 87 F.3d 44, 49 (2d Cir. 1996) (citing Palazzo v. Palazzo, 121 A.D.2d 261, 265, 503 N.Y.S.2d 381, 384 (1st Dep't 1986)). Under New York law, a "confidential relationship" in this context refers to "a relationship 'which induced plaintiff to entrust defendant with property or money.'" KJ Roberts & Co. Inc. v. MDC Partners Inc., No. 12 CIV. 5779 (LGS), 2014 WL 1013828, at *12 (S.D.N.Y. Mar. 14, 2014) (quoting Beck v. CIT Group/Credit Fin., Inc., No. 95 Civ. 5800, 1998 WL 655547, at *4 (S.D.N.Y. Sept. 24, 1998)). Further, "'[a] fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another.'" Faulkner v. Arista Records LLC, 602 F. Supp. 2d 470, 482 (S.D.N.Y. 2009) (alteration added) (quoting Cooper v. Sony Records Int'l, 2001 WL 1223492, at *5 (S.D.N.Y. Oct. 15, 2001)); see also Mexican Hass Avocado Importers Ass'n v. Preston/Tully Grp. Inc., 838 F. Supp. 2d 89, 97 (E.D.N.Y. 2012) ("'The fiduciary relationship necessary to obtain an accounting is created by the plaintiff entrusting to the defendant some money or property with

respect to which defendant is bound to reveal his dealings.'") (quoting <u>Stevens v. St. Joseph's</u> <u>Hosp.</u>, 52 A.D.2d 722, 723, 381 N.Y.S.2d 927, 929 (4th Dep't 1976)).

However, "'generally, an arm's length business transaction, even those where one party has superior bargaining power, is not enough to give rise to a fiduciary relationship.'" <u>Faulkner</u>, 602 F. Supp. 2d at 482 (quoting <u>Sony Music Entertainment, Inc. v. Robison, et al.</u>, 2002 WL 272406, at *3 (S.D.N.Y. Feb. 26, 2002)); <u>see also</u> <u>Reuben H. Donnelley Corp. v. Mark I Mktg.</u> <u>Corp.</u>, 893 F. Supp. 285, 289 (S.D.N.Y. 1995) ("'[A] conventional business relationship does not create a fiduciary relationship in the absence of additional factors[.]") (alteration added) (quoting <u>Feigen v. Advance Capital Mgmt. Corp.</u>, 150 A.D.2d 281, 283, 541 N.Y.S.2d 797, 799 (1st Dep't 1989)).

Of importance, New York courts have repeatedly dismissed accounting claims where the parties' relationship arises from a contract.  <u>See, e.g.</u>, <u>Rosa</u>, 2016 WL 67729 at *7 ("Moreover, with respect to Malik, the only alleged relationship is that they negotiated the Subscription Agreement and worked together. (SAC ¶¶ 39, 62.) Such 'arm's length business dealings' have been found insufficient to state an accounting claim under New York law . . . . . Accordingly, the accounting claim is dismissed with prejudice as to Defendants Holdco, TCC Wireless, and Malik."); <u>LaRoss Partners, LLC v. Contact 911 Inc.</u>, 874 F. Supp. 2d 147, 167 (E.D.N.Y. 2012) (Spatt, J) ("Here, the Amended Complaint describes a contract to perform certain services and share revenues. There are no allegations — not even conclusory ones — so as to transform this ordinary commercial relationship into a fiduciary one. Therefore, the Plaintiff's cause of action for an accounting is dismissed."); <u>Faulkner</u>, 602 F. Supp. 2d at 484 ("Plaintiffs' fourth claim for an accounting of Arista's financial affairs as they pertain to the agreements between Parties likewise fails given the absence of a fiduciary relationship in this case.").

With respect to the third element of an accounting claim — namely, whether there is no adequate remedy at law —, New York courts have held that "an equitable accounting claim cannot coexist with a breach of contract claim covering the same subject matter." Ellington, 837 F. Supp. 2d at 207. That is because a plaintiff would be able to obtain the information and damages through discovery of his or her breach of contract claim, and thus, he or she has an adequate remedy at law. See Gate Techs., LLC v. Delphix Capital Markets, LLC, No. 12 CIV. 7075 (JPO), 2013 WL 3455484, at *8 (S.D.N.Y. July 9, 2013) ("'Plaintiff[s] ha[ve] sought money damages in [their] breach of contract claim, and because discovery as to the measure of damages would be available to [them] if [they] were to prevail on that claim, [they] can obtain all the information [they] seek[ ] in [their] existing claim at law.'") (quoting Banks v. Correctional Servs. Corp., 475 F.Supp.2d 189, 202 (E.D.N.Y. 2007) (footnote omitted)); CSI Inv. Partners II, L.P. v. Cendant Corp., 507 F. Supp. 2d 384, 425 (S.D.N.Y. 2007) ("An accounting claim is not proper where money damages are recoverable under alternative causes of action for the same injury.") (citing Banks, 475 F. Supp. 2d at 202).

Accordingly, New York courts have dismissed equitable accounting claims where, as here, the plaintiff asserts a breach of contract claim seeking similar relief. See, e.g., Herbert H. Landy Ins. Agency, Inc. v. Navigators Mgmt. Co., No. 14 CIV. 6298 LGS, 2015 WL 170460, at *2 (S.D.N.Y. Jan. 13, 2015) ("Plaintiff's breach of contract claim precludes the related claim for an accounting against Navigators because 'an equitable accounting claim cannot coexist with a breach of contract claim covering the same subject matter.'") (quoting Ellington, 837 F. Supp. 2d at 207); Physicians Mut. Ins. Co. v. Greystone Servicing Corp., No. 07 CIV. 10490 (NRB), 2009 WL 855648, at *11 (S.D.N.Y. Mar. 25, 2009) ("[T]his cause of action still arises from the same operative facts as plaintiffs' contract breach claim. As such, Count VII is likewise

dismissed."); Banks, 475 F. Supp. 2d at 202 ("Because Plaintiff has sought money damages in his breach of contract claim, and because discovery as to the measure of damages would be available to him if he were to prevail on that claim, he can obtain all the information he seeks in his existing claim at law. Accordingly, no purpose would be served by treating Plaintiff's equitable accounting claim as an additional, and duplicative, action at law. Defendants' motions to dismiss Plaintiff's claim for an accounting are granted.") (footnote omitted).

Here, with respect to the first element, AMB asserts in its reply brief that it had a "mutual and confidential relationship" with CalCon by virtue of their "merged operations." (The Pl.'s Reply Mem. of Law, Dkt. No. 117, at 6–7.) With respect to the third element, it contends that CalCon has refused several discovery demands from AMB for its financial records and therefore, AMB asserts that it "has been left with no other option but to seek an accounting of [CalCon's] zealously guarded financial information by way of an accounting request cause of action." (Id. at 7.) The Court finds both contentions by AMB to be without merit.

First, there are no allegations in the SAC which refer to circumstances suggesting the existence of a fiduciary or confidential relationship between AMB and CalCon. To the contrary, the SAC's request for an accounting is replete with references to CalCon's obligations under the Rescission Agreement. For example, the SAC states that it is entitled to an accounting because AMB "believes that [CalCon] owes monies pursuant to the Rescission Agreement," and the Rescission Agreement requires CalCon to "make its business records, bookkeeping, and accounting records, sales and income tax records, and returns available for an audit[.]" From these allegations, the only plausible inference is that the obligations of the parties were defined by the Merger and Rescission Agreements and not by reference to any special relationship of confidentiality or trust, as AMB contends.

Second, the accounting claim fails for the additional reason that it is entirely duplicative of the breach of contract claim and thus, AMB has a sufficient legal remedy to obtain CalCon's financial records through discovery in the context of its breach of contract claim.

The fact that AMB has not been satisfied with CalCon's responses to its discovery requests does not give AMB the right to an equitable remedy of accounting. Indeed, the Federal Rules provide AMB with a remedy to address precisely this scenario by filing a motion to compel CalCon to produce the requested financial information pursuant to Fed. R. Civ. P. 37. Thus, the Court finds that AMB can seek recourse for its measure of damages using ordinary discovery tools and therefore, it has a sufficient remedy at law. See Leveraged Leasing Admin. Corp., 87 F.3d at 49 ("Because the plaintiffs have sought money damages in both their breach of contract and conversion claims, and because discovery as to the measure of damages would be available to them if they were to prevail on those claims, they can obtain all the information they seek in their existing claims at law . . . . Accordingly, no useful purpose would be served by treating the plaintiffs' equitable accounting claim as an additional, and duplicative, action at law. And the district court was correct in implicitly declining to do so.").

Accordingly, the Court also denies AMB's motion, to the extent it seeks to add an equitable accounting claim, as futile.

### III. CONCLUSION

For the foregoing reasons, AMB's motion to amend the complaint is (i) granted to the extent it seeks to remove the eighth and ninth causes of action and alter existing allegations; and (ii) denied as futile to the extent it seeks to add new causes of action for violation of the CFAA, unjust enrichment, and equitable accounting.

Within 10 days of the date of this Order, AMB may file an amended complaint in conformance with this Order.

**SO ORDERED**
Dated: Central Islip, New York
February 5, 2016


                                        */s/ Arthur D. Spatt*
                                        ARTHUR D. SPATT
                                        United States District Judge